UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

                                                    **REPORT**
                                                     **and**
                    v.                        **RECOMMENDATION**


MICHAEL J. MANEY,                                **04-CR-106A(F)**

                    Defendant.
_____

APPEARANCES:         TERRANCE P. FLYNN
                     UNITED STATES ATTORNEY
                     Attorney for the Government
                     MARY ELLEN KRESSE
                     Assistant United States Attorney, of Counsel
                     Federal Centre
                     138 Delaware Avenue
                     Buffalo, New York 14202

                     JOSEPH MISTRETT
                     FEDERAL PUBLIC DEFENDER
                     Attorney for Defendant Michael J. Maney
                     JOHN F. HUMANN
                     Assistant Federal Public Defender, of Counsel
                     300 Pearl Street, Suite 450
                     Buffalo, New York   14202


                          **JURISDICTION**

     This case was referred to the undersigned by the Hon. Richard J. Arcara for

disposition of all pretrial matters pursuant to 28 U.S.C. §636(b)(1)(A) and for report and

recommendation pursuant to §636(b)(1)(B).  (Doc. No. 28).  The matter is presently

 before the court on Defendant's motion to suppress filed January 19, 2005. [1]  (Doc. No.

_____

     [1] Defendant also requested *Brady* and Jencks Act material, as well as grand jury testimony.  (Doc.
No. 21 ¶¶ 4-8.  However, Defendant stated on February 9, 2006 that all non-dispositive issues have been
resolved.  (Tr. I 11).  As such, the court deems Defendant's requests for non-dispositive relief as moot.

21).

## BACKGROUND

On September 18, 2003, a criminal complaint was filed against Defendant, Michael J. Maney ("Defendant" or "Maney") alleging that Maney violated 18 U.S.C. § 1033(b)(1) by misappropriating insurance premiums.  (Doc. No. 1).  Subsequently, on May 27, 2004, Defendant was charged in a single-count indictment with violating 18 U.S.C. §§ 1033(b)(1)(A), and 2.  Specifically, it is alleged that Defendant, while an agent of Travelers Insurance ("Travelers") and CGU Insurance (f/k/a "One Beacon"), knowingly and willfully misappropriated insurance premiums belonging to Travelers and One Beacon over an approximate two year period.

As noted, Defendant filed the instant motion on January 19, 2005 ("Defendant's motion"), along with the Affidavit of John F. Humann, Assistant Federal Public Defender ("Humann Affidavit") and the Affidavit of Michael Maney ("Maney Affidavit") (Doc. No. 21).  Defendant contends a written statement obtained from him by investigators on January 29, 2003 was obtained in violation of his *Miranda* rights, and involuntary. Humann Affidavit ¶¶ 1-3; Maney Affidavit ¶¶ 3-4; Defendant's Memorandum at 5-7, 9-10.  An evidentiary hearing was conducted before the undersigned on February 9, 10, and on March 21, 2006.  The hearing was closed on May 4, 2006 upon receipt of written notice from the Government electing not to call a rebuttal witness.  (Doc. Nos. 38, 39).

Defendant filed a Memorandum of Law in support of Defendant's motion on July 5, 2006.  ("Defendant's Memorandum")  (Doc. No. 41).  On July 26, 2006, the Government filed its Memorandum of Law in Opposition to Defendant's Motion to Suppress.  ("Government's Response") (Doc. No. 43).  Oral argument was deemed

unnecessary.


**FACTS**[2]

The charges in this case arise from an investigation conducted by the

New York State Insurance Department ("NYSID"), the United States Postal Inspector's

Office ("Postal Inspector's Office") and the Federal Bureau of Investigation ("FBI") of

alleged misappropriation of insurance premiums by Maney.  Specifically, Maney was

suspected of failing to forward premiums to Travelers and One Beacon which he had

received from his commercial customers and converting them to his own use.

In November 2001, Maney suffered a substantial business set-back when one of

Maney's major accounts cancelled Maney as its insurance agent.  Tr. III 83-84.[3]  As a

result, Maney failed to forward in a timely fashion some of his remaining insureds'

premiums under policies issued by Travelers and One Beacon, using the money to

maintain his business and pay for personal expenses.  Tr. I 2-3, 5; (Government Exhibit

3505).[4]  Defendant attempted, unsuccessfully, to work out the ensuing financial problem

with the carriers to which the premiums were owed.  Tr. III 86-87.  As a result, the New

York State Insurance Department Frauds Bureau ("NYSIDFB") received complaints

---

[2] Taken from the pleadings and papers filed in this action.

[3] "Tr." references are to pages of the suppression hearing transcripts filed in this case.
References to "Tr. I___" are to the transcript from February 9, 2006 (Direct Testimony of Agent Halter).
"Tr. II___" refers to the transcript from February 10, 2006 (Cross-Examination and Re-Direct Examination
of Agent Halter and the Direct Examination of Inspector Moehring).  "Tr. III___" refers to the transcript from
March 21, 2006 (Direct Examination of Inspector Moehring, continued, Cross-Examination of Inspector
Moehring and Direct Examination and Cross-Examination of Michael Maney).

[4] "Government Exhibit(s) ___" refer to exhibits admitted into evidence during the suppression
hearing.

from Travelers and One Beacon that Maney failed to remit premiums.  Tr. I 7-8.  Initially,

NYSIDFB Investigator David Hahn ("Hahn") was assigned to the matter.  Tr. I 8.

Sometime later, Hahn enlisted the assistance of United States Postal Inspector Thomas

Moehring ("Moehring").  *Id.*  Moehring became involved because the matter concerned

a failure to remit premiums through the mail.  Tr. II 75.

On December 19, 2002, Hahn and Moehring spoke to Maney at an auto

dealership, Maney's then place of employment.  Tr. III 88.  During the encounter,

Moehring informed Maney that Moehring was a postal inspector investigating potential

mail fraud relating to Maney's previous insurance business.  Tr. III 6-7.  Moehring

informed Maney that Maney had failed to remit premiums from Maney's prior clients to

certain insurance companies Maney had then represented.  *Id.*  Moehring identified

himself to Maney as a postal inspector, told Maney the matter was "serious," and

specifically stated Moehring was investigating Maney for possible mail fraud.  Tr. III 88-

89.  Maney understood mail fraud can be a crime.  *Id.*  At that time, Hahn identified

specific payments Maney owed to the carriers.  Tr. III 8.  During that encounter Maney

realized Hahn was with the NYSIDFB.  Tr. III 87.  Maney also understood that Hahn

never represented this matter was civil in nature and agreed that Hahn had not denied

Hahn was conducting a criminal investigation.  *Id.* at 87-88.  Further, Moehring advised

Maney that mail fraud was a federal felony.  Tr. III 7.  Moehring gave Maney his

business card and requested Maney contact him to further discuss the matter.  Tr. III 8.

In January 2003, Hahn and Moehring determined the investigation would be

presented to the United States Attorney for possible prosecution.  Tr. II 75-76.  At that

point, Moehring contacted the local office of the FBI as the FBI also had jurisdiction to

4

investigate mail fraud.  Tr. II 77-78; Tr. I 14-15, 41-42.  As Moehring had previously

worked with FBI Agent Steven Halter ("Halter") from the FBI's White Collar Squad,

whom Moehring knew had experience with fraud investigations, Moehring requested

Halter assist with the investigation.  Tr. II 76, 78, 80-81.

Subsequently, Halter and Moehring attempted to speak with Maney at his

residence, however, Maney's wife informed them that Maney was not home.  Tr. II 84.

Moehring left Maney's wife with his business card and asked her to request Maney to

contact Moehring.  Tr. II 84-85; Tr. I 19.  Thereafter, Maney contacted Moehring by

telephone and told Moehring that he was attending a conference in Massachusetts.  Tr.

II 85.  During the phone conversation, Moehring and Maney planned to meet on

January 29, 2003 at Moehring's office located in a downtown office building in Buffalo,

New York.  Tr. II 86-87; Tr. III 12.  Moehring informed Maney that the purpose of the

meeting was to discuss Maney's alleged failure to remit insurance premiums to

insurance companies which he had represented as an agent.  Tr. II 86.   Moehring also

stated to Maney the nature of Moehring's jurisdiction and why the Postal Inspector's

Office was involved in the investigation.  Tr. III 12.

Moehring and Halter testified it is typical in white collar crime investigations to

attempt to interview subjects before the matter is presented to the United States

Attorney's office for possible prosecution.  Tr. I 25-27, 28, 38, 39; Tr. II 45, 81-82; Tr. III

19-20.  According to Moehring and Halter, subjects who agree to be interviewed are not

usually arrested immediately because of the non-violent nature of the alleged crimes

and the need for United States Attorney Office review, unless they fail to respond to

later communications from the United States Attorney.  Tr. I 39-40, 69-70, 81; Tr. II 92;

5

Tr. III 34-35, 38-39, 44, 46-47.

Moehring's office is in a commercial office building open to the public located in Buffalo's central business district.  Tr. I 43-44.  Access to Moehring's office is obtained by public elevator to a reception area where there is a locked door and a reception window.  Tr. I 43-44.  The Postal Inspectors' offices occupy the entire floor.  Tr. I 44. There is no metal detector and no security guard for the office.  *Id.*  The room where Moehring and Halter interviewed Maney was approximately 12 x 12 feet in size.  Tr. I 45.  A small conference table and chairs were located in the room.  *Id.*  The room, located off of a hallway in the office, had one door and no windows.  *Id.* at 45-46.

Maney came alone for the interview as scheduled on January 29, 2003.  Tr. III 74, 99.  When Maney arrived at the office, he was greeted by Moehring, who thanked him for coming, told Maney he was doing "the right thing," and offered Maney something to drink.  Tr. II 87-88; Tr. III  22, 120.  Maney accepted and he was brought a cup of coffee.  Tr. III 22.  As Agent Halter had not yet arrived at the office, Tr. II 88; Tr. III 22-23; Tr. I 45; Tr. III 66, 100, Moehring told Maney he was free to leave at any time and also informed Maney he was not under arrest.  Tr. III 22.   Halter arrived after this information was communicated to Maney.  Tr. II 89.  Moehring testified Halter also advised Maney that Maney was not then under arrest.  Tr. II 88.  Maney was never told by the agents he could not leave the office.  Tr. III 76, 120.  During the interview, Moehring was seated to the right of the conference table, Maney was seated to the left, and Halter was seated near the door.  *Id.* at 46-47.  It is not disputed that Maney was not given any *Miranda* warnings during the meeting.  Tr. I 67; Tr. III 23.

At the outset of the meeting, in order to protect Maney's right to assistance of

6

counsel, Agent Halter asked Maney if Maney had an attorney, and Maney stated he did not.  Tr. I 62-63.  Halter also advised Maney that Maney need not answer questions he did not wish to answer and that Maney was free to leave at the conclusion of the interview, unless Maney should unexpectedly confess to committing a violent crime.  Tr. I 67-68, 70, 96-100.  Halter did not inform Maney he was free to leave at any time, but testified that is what Halter intended as the meaning of his statement to Maney.  Tr. I 97. For example, although not specifically stated as such to Maney, Halter testified that Maney could have ended the interview at any time.  *Id.*

At the beginning of the interview after his approval, Agent Halter identified himself to Maney as an FBI agent.  Tr. I 47.  When Maney questioned the FBI's belated involvement in the matter, Halter responded to Maney that the FBI investigates alleged violations of federal criminal law, including mail fraud.  Tr. I  48.  During the interview, Maney was offered a break on at least one occasion which Maney declined; at no time during the interview did Moehring or Halter display to Maney their weapons or handcuffs.  Tr. II 90, 92.  At the time of the interview, Maney was 58, educated, and had worked as an insurance agent for 31 years while operating his own insurance business for 10 years.  Tr. III 77.

At the end of the interview, Agent Halter wrote out a statement summarizing what Maney had said to the agents during the interview.  Tr. I 82; Government Response, Exhibit 2.  It was Halter's general practice in a white collar investigation to ask a cooperative subject such as Maney, if he desired to provide a written statement, to write the statement out for the subject and review the statement with the subject prior to obtaining the subject's signature.  Tr. I 82-83; Tr. II 49-50, 54; Tr. III 40-41.

7

After preparing the statement at the end of the interview, Agent Halter

encouraged Maney to review and make changes to the written statement, because the

statement was to be "his [Maney's] statement" and "everything had to be factually

correct."  Tr. I 83.  Maney then reviewed the statement and made changes to the

statement, initialing the beginning and ending of each paragraph.  Tr. III  36, 41, 42.  In

response to Halter's offer to do so, Maney reduced the amount of estimated loss from

his failure to remit premiums, as written by Halter, to $93,000 from $160,000.  Tr. III 43.

The interview lasted from 9:25 a.m. until 10:45 a.m.  Tr. II 89-90; Tr. III 34.  At the

conclusion of the interview, Maney was told the information would be presented to the

United States Attorney's Office for possible prosecution, and that Maney would not be

arrested if he responded to any further contact from the United States Attorney's Office.

Tr. I 93.


**DISCUSSION**

**A.      Failure to administer Miranda warnings**

Maney asserts that the written statement, prepared by Agent Halter, he signed

on January 29, 2003 was taken in violation of his *Miranda* rights.  Humann Affidavit ¶ 2;

Maney Affidavit ¶ 3.  Specifically, Maney argues that he was subjected to a custodial

interrogation when he gave and signed the statement, and therefore should have

received *Miranda* warnings at the outset of the meeting with the agents.  Defendant's

Memorandum at 9-10.  Although Maney acknowledged he came to the interview

voluntarily, Maney contends that (1) as he was told the purpose of the meeting was to

"discuss the numbers," not to investigate a criminal matter, he was misled as to the purpose of the meeting; (2) Inspector Moehring never asked Maney to contact Moehring to set up the interview, but visited Maney's place of employment at the auto dealership to inform Maney that they wished only to review some documents with Maney and inform Maney that Moehring and Hahn were investigating the matter; and (3) Maney was told he would be arrested if he did not sign the statement prepared by Agent Halter at the conclusion of the January 23, 2040 meeting, changing the non-custodial interview into a custodial interrogation. *Id.* In support, Maney denies Moehring told Maney that Maney was free to leave at the end of the interview, or that Moehring merely referred to "kill[ing] the Lindbergh baby" as an example of a violent crime for which Maney would be arrested if admitted to during the course of the interview. Tr. III 76-77.

Based on the record, the court finds that *Miranda* warnings were not required because Maney was neither in custody during the interview nor when he signed the written statement at issue. Further, taken as a whole, the record demonstrates that Maney's statement was voluntary. Despite an occasional oblique response to some questions, both agents testified credibly, Maney's testimony was not credible in describing his perceptions of the meeting as custodial and in asserting he was deliberately misled as to the purposes of the interview, and that his signature on the statement was coerced.

Before a custodial interrogation is commenced, a suspect must be informed of his right to remain silent and his right to the presence of an attorney prior to questioning, regardless of his ability to afford one. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966) ("*Miranda*"). The requirement of *Miranda* warnings is limited to interrogation of a

9

suspect while in custody.  *Thompson v. Keohane,* 516 U.S. 99, 107 (1995).  *Miranda* does not require that notice of constitutional rights be given to a person who, outside of custody (or some equivalent thereof), volunteers statements to police.  *Minnesota v. Murphy,* 465 U.S. 420, 433-34 (1984), *reh'g denied,* 466 U.S. 945 (1984); *United States v. Montgomery,* 675 F.Supp. 164, 170-71 (S.D.N.Y. 1987), *aff'd sub nom. United States v. Willoughby,*  860 F.2d 15 (2d Cir. 1988).  In *Miranda,* the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda,* 384 U.S. at 444.

Although Maney was questioned in relation to a criminal matter in which he was a suspect, this fact alone does not render the interrogation custodial. *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (citing *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (no requirement to administer *Miranda* warnings "simply because the questioned person is one whom the police suspect")); *Tankleff v. Senkowski,* 135 F.3d 235, 242 (2d Cir. 1998) ("A suspect is entitled to *Miranda* warnings only if he or she is interrogated while 'in custody.'").  An interrogation is custodial when authorities affirmatively convey, through acts or words, that the accused is not free to leave.  *Berkemer v. McCarthy*, 468 U.S. 420, 442 (1984); *see also United States v. Mitchell,* 966 F.2d 92, 98 (2d Cir. 1992). "Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave."  *Mitchell, supra,* at 98  "The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to

10

restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence of absence of affirmative indications that the defendant was not free to leave." *Tankleff,* 135 F.3d at 243-44.  In making this determination, all circumstances surrounding the interrogation must be considered.  *Id.* at 243.  Courts therefore considered various factors, including the location and atmosphere of the interrogation, the language and tone of questioning by the police, whether a suspect is searched, frisked or patted down, the length of the interrogation and whether the suspect is told he is not free to leave.  *Id.* at 244.

It is undisputed that Maney was not informed of his *Miranda* rights at any time during the interview on January 29, 2003.  Maney's recollection of what transpired during the interview and how the statement was made differs from that recalled by Halter and Moehring, however, based on the credible testimony of Halter and Moehring and the other evidence in the record, the court finds Halter's and Moehring's recollections to more accurately represent what actually occurred at the meeting.

Although Maney claims neither Halter nor Moehring advised him that he was free to leave at any time, both agents testified, and the court finds, the agents informed Maney that he was free to leave, and that he was not then under arrest.  Tr. III 34; Tr. I 70, 96-100.  When Maney arrived at Moehring's office, Moehring testified that he informed Maney he was free to leave at any time and stated Maney was not under arrest.  Tr. III 34.  Before commencing his interview of Maney, Halter advised Maney he was free to leave at the conclusion of the interview.  Tr. I 70, 96-100.  While Halter did not specifically also tell Maney, as did Moehring, he could leave the interview at any point, given the other indicators that the interview was non-custodial, and that Moehring

11

had specifically so informed Maney immediately prior to Halter's arrival, such failure by Halter did not render the meeting custodial in nature.

Maney further contends that even if the interview had not qualified as a custodial interrogation at its onset, it became custodial when Moehring threatened that Maney may be arrested on the spot, or in front of his family, or at his work if he did not cooperate.  Defendant's Memorandum at 10; Humann Affidavit ¶ 2; Tr. III 71-72.  The credible testimony does not support this contention.  Moreover, even if true, such conduct by Moehring did not transform the otherwise voluntary conference into a custodial interrogation.  While a defendant who has made extensive admissions could later be coerced into signing a written form of the admissions, it is not plausible to believe that Maney reasonably perceived he was then not free to leave if he refused to sign the statement at issue having already orally provided the information to the agents during the course of the meeting.

Importantly, Maney fails to contradict that he was under no compulsion to attend the conference, and the record demonstrates the agents in no way communicated such an obligation to Maney's wife when they visited his home in an attempt to meet with him to discuss Maney's alleged defalcations.  Tr. I 9; Tr. II 84-85, 87; Tr. III 74, 99.   The court also considers Maney's admission that the was encouraged to make changes in his signed statement as indicative of the cooperative atmosphere that existed upon Maney's arrival at the office and during the meeting, as described by Halter and Moehring.  For example, Maney initialed the beginning and ending of each paragraph of the written statement thus supporting Agent Halter's testimony that Halter reviewed each line of the statement with Maney and encouraged him to make changes to the

statement where necessary in order to assure its accuracy.  Tr. III  36, 41, 42.   Maney's change in the text reducing the amount of estimated loss to $93,000 from $160,000 is also consistent with Maney's stated belief that the purpose of the meeting was to determine the amount of the loss.  Tr. III 106, 109-111.  Although Maney claims that, after returning to the conference room, Halter became angry upon learning Maney refused to sign the statement and that Maney was threatened with arrest by Moehring, Tr. III 71.  Even if Halter expressed frustration at Maney's reluctance to sign the written statement, as Maney maintains, such frustration is insufficient to recast the entire interview, including the agent's request that maney sign the statement, into a custodial interrogation given all other evidence of record consistent with its objectively non-custodial nature.  Additionally, the court finds no credible evidence supports Maney's assertion that Moehring threatened him with arrest to gain Maney's signature to the statement.

Further, courts consider the location and atmosphere of the interrogation, the language and tone of questioning by the police, whether the suspect is searched, frisked, or patted down, the length of the interrogation and whether the suspect is told he is free to leave.  *Tankleff,* 135 F.3d at 244.  Here, the interview took place in a public office, not a secure law enforcement facility.  Tr. I 43-44.  The reception area of Moehring's office was similar to a reception area of a physician's office except that the door from the reception area to the interior offices was locked.  *Id.* at 44-45.  For example, there was no metal detector through which Maney had to walk to gain access to the office.  Tr. I 44.  At the outset, the atmosphere of the interview, more of a discussion than an interrogation format, was relaxed.  Id. at 52-55, 58-61.  When Maney

13

arrived, he was greeted by Moehring who offered and brought him a cup of coffee.  Tr. II 87-88; Tr. III 22, 120.  As discussed, Moehring informed Maney he was free to leave at any time and that he was not under arrest.  Tr. III 34.

When Agent Halter arrived, he likewise informed Maney he was not under arrest, and would not be so placed unless he confessed to committing a violent crime.  Tr. I 70, 96-100.  As noted, at the outset Halter also asked if Maney had counsel, and Maney replied he did not.  Tr. I 62-63.  Halter stated Maney was free to leave at the end of the interview, and told Maney he did not have to answer every question.  *Id*.  Maney was offered at least one "comfort break," which he declined.  Tr. II 92.  According to Halter, Maney was focused and attentive.  Tr. I 54.   At the conclusion of the interview, Maney was asked if he would provide a written statement summarizing what was discussed that day, and Maney agreed to do so.  Tr. I 82.  Agent Halter reviewed the statement with Maney, and, as noted, Maney made changes to the statement before signing it. Tr. III 36, 41, 42.  Based on the physical circumstances and atmosphere of the interrogation, the court finds a reasonable person would not objectively believe he was not free to leave during the interview.  *Tankleff,* 135 F.3d at 243-44; *see also United States v. Newton,* 369 F.3d 659, 672 (2d Cir. 2004), *cert. denied,* 543 U.S. 947 (2004).

Additionally, the court finds the weight of the evidence supports a finding that the language and tone of questioning used by Agent Halter and Inspector Moehring was non-threatening and cooperative in nature.  Before commencing the interview, Halter asked if Maney had an attorney, negating the presence of a confrontational approach by the agents.  The fact that the investigators not only allowed but encouraged Maney to make changes to the written statement also undermines Maney's contention that he

14

was forced to sign the statement or threatened with arrest if he failed to do so.   Rather, such fact is more consistent with the agents' testimony describing a cooperative, non-intimidating discussion with Maney concerning Maney's conversion of the unremitted premiums, the subject matter of the investigation.   Indeed, Maney's belief that he was coming to discuss "the numbers," Tr. III 103-04, is inconsistent with Maney's contention that he had been placed in a custodial situation.   If Maney genuinely believed his presence at the interview was to discuss only non-criminal aspects of the matter, as his argument presumes, Maney could not also reasonably have believed he would be subjected to a custodial interrogation.

Moreover, when, upon Halter's arrival, Maney first learned that the FBI, which investigates federal criminal violations that include insurance premium embezzlement, was involved in the investigation, it can be fairly assumed that a reasonable person of Maney's age, background and business experience would understand that he was being investigated for a federal criminal matter.   A reasonable person, in the present era, understands the FBI's basic purpose is to put criminals in jail, not to collect money on civil debts and it is unpersuasive to argue otherwise.   As Maney admitted that he understood mail fraud, the offense perceived by the agents, could be a crime and that Inspector Moehring told Maney he was being investigated for mail fraud by the Postal Inspection and the FBI, it is reasonable to hold Maney to the knowledge that he was the subject of a federal criminal investigation.[5]  Tr. III  88-89.   If Maney subjectively did not so believe, then Maney did not act in an objectively reasonable manner, the standard

---

[5]  The fact that Maney was eventually charged with insurance premium embezzlement, a related form of offense, is irrelevant to the issue.

15

against which his assessment of the circumstances he confronted at the interview must be measured. *Tankleff,* 135 F.3d at 243-44. Maney's contention that the interview was a custodial interrogation because he was misled as to the purpose of the meeting, or subjectively misunderstood it is, under all the circumstances, therefore not credible and without foundation in the record.

Finally, although Maney alleges he was subjected to a pat-down to uncover any recording devices Defendant might have hidden on his person, Agent Halter denied Maney was subjected to any pat-down. Tr. III 67; Tr. II 14. The court finds that in light of the heightened national security concerns prevailing at the time of the conference, which reasonably could have required a pat-down in an office occupied by federal law enforcement personnel, particularly in the absence of a metal detector, such pat-down, if it occurred, was insufficient to cause a reasonable person to believe he was then in custody. Assuming, therefore, that Maney may have been subjected to a pat-down before the interview officially began, in light of all the other credible testimony demonstrating the non-custodial nature of the interview, standing alone, the asserted pat-down is insufficient to render the interview custodial in nature. Additionally, no evidence suggests that the Postal Inspectors' offices included any of the indicia typical of a more traditional law enforcement facility such as jail cells, armed and uniformed personnel or handcuffed suspects. Considering all relevant factors, the interview in its entirety did not constitute a custodial interrogation. Thus, Maney was not entitled to *Miranda* warnings at any point during the interview including when the agents requested that Maney sign the written statement.

16

**B.      Voluntariness of the Signed Statement**

Maney also contends his statement was involuntary because he was (1) misled as to the purpose of the January 23, 2004 meeting, he was not informed he was being investigated for a crime; (2) not allowed to "put the [entire] statement in his own words"; (3) threatened with arrest if he did not sign the statement; and (4) not advised that he need not sign the written statement.   Defendant's Memorandum at 5-7.   Maney particularly objects to Agent Halter's inclusion of the word "illegal" in the statement, to describe his intent in converting the premiums, asserting the word "illegal" was Halter's, not Maney's.   *Id.* At 7.

Under the Fifth Amendment, a confession "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan,* 378 U.S. 1,7 (1964) (quoting *Bram v. United States,* 168 U.S. 532, 542-43 (1897)).   A confession's voluntariness is to be determined by viewing the totality of the circumstances and assessing whether the conduct of the government agents "was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . .."   *United States v. Kaba,* 999 F.2d 47 (2d Cir. 1993) (citing *United States v. Guarno,* 819 F.2d 28, 30 (2d Cir. 1987) (quoting *Rogers v. Richmond,* 365 U.S. 534, 544 (1961)).   The relevant circumstances include the accused's age and education, whether the accused was advised of his constitutional rights, the length of the interview and the type of questioning, and the use of physical deprivations. *Schenckloth v. Bustamonte,* 412 U.S. 218, 226 (1973).   Additionally, the court should consider the physical conditions of the interrogation and the conduct of law enforcement

17

officials doing the questioning.  *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.

1991);  *Green v. Scully,* 850 F. 2d 894, 901-02 (2d Cir.), *cert. denied,* 488 U.S. 945

(1988).

Significantly, Maney's involuntariness contention is directed only to the written

statement he initialed and signed at the interview.  Humann Affidavit ¶¶ 1-3; Maney

Affidavit ¶ 4; Defendant's Memorandum at 1.  Maney does not, apparently, object to the

verbal statements made to the agents earlier in the interview prior to being asked to

review and sign the written statement.[6]  Humann Affidavit ¶¶ 1-3; Maney Affidavit ¶ 3;

Defendant's Memorandum at 1.  Therefore, the court finds that, up to that point, Maney

concedes the circumstances of the January 23, 2003 meeting were not coercive and

that his verbal statements, as incorporated in the final written statement, with the

possible exception of the word "illegal" to describe Maney's state of mind, were

voluntarily given by him.  As noted, Maney specifically seeks to suppress the word

"illegal" in the statement as indicative of his intent when he failed to remit the premiums.

Based on the record, the court finds Maney's written statement and signature

were voluntarily obtained for several reasons.  At the time of the interview and as

stated, Maney was age 58, educated, had worked as an insurance agent for 31 years

and owned his own insurance business for 10 years.  Tr. III 77.  Halter at the outset

inquired if Maney had obtained legal counsel.  The record further establishes that his

conversation with the agents lasted no more than an hour and a half, running from

approximately 9:25 a.m. until 10:45 a.m.  Tr. II 89-90; Tr. III 34.  The court does not find

---

[6] Maney's interview statements are preserved in Moehring's memorandum, which summarizes the interview.  Government Exhibit 3505.

this time period to be excessive in length sufficient to cast doubt on whether Maney's signature was coerced as a result.  Admissions after longer periods of questioning have been sustained against claims of involuntariness.  *Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir. 1996) (questioning over a period of four hours) (citing *Maxwell v. Russi*, 1992 WL 106302 (W.D.N.Y. April 2, 1992 (confession of 17 year old over 6 ½ hours not involuntary)); *Zapata v. Greene*, 2005 WL 1521186 *11 (E.D.N.Y. June 27, 2005) (continual questioning over five hours); *see also United States v. Okumabua*, 828 F.2d 950, 953 (2d Cir. 1987) (questioning for one hour did not render interview coercive), *cert. denied*, 484 U.S. 1063 (1988).  As discussed, Discussion, *supra,* at 14, 18, the overall tone of the interview, fully supported by the record, was friendly and cooperative. Maney was never deprived of any physical needs during the interview, such as food or toilet facilities.  Halter even asked Maney if he was then represented by an attorney in connection with the investigation.  These circumstances therefore are not suggestive of law enforcement conduct calculated to overbear Maney's will to resist the agent's request that Maney sign the statement which described his knowledge that his misconduct was "illegal."  *Rogers,* 365 U.S. at 544.

As for Maney's contention that his statement was involuntary because he was misled as to the purpose of the meeting, the court fails to see how Maney's misperception about the agents' objective for the meeting, even assuming the agents in fact misrepresented their true purposes, defeats the otherwise voluntary nature of the encounter.  Significantly, as noted, Maney's contention essentially concedes that, up to the point when Maney was asked to sign the statement, the interview was voluntary and thus any misperceptions by Maney as to the agent's investigative objectives are

19

irrelevant.  While deliberate misrepresentation by investigators during an interrogation may create involuntariness, *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (misrepresentation by police that accused's companion confessed); *Lynumn v. Illinois,* 372 U.S. 528, 534 (1963) (police falsely threatened to end financial aid to defendant's children and take them away if she did not confess); *Spano v. New York,* 360 U.S. 315, 323 (1959) (police officer falsely told suspect he would lose his job if suspect did not confess), no such purposeful or material  misleading occurred here, and Maney points to none.

First, no caselaw supports finding involuntariness based on an affirmative misrepresentation by law enforcement as to the purpose of the suspect's questioning, and Maney offers no authority to support this contention.  Second, "[t]he Supreme Court has specifically declined to outlaw all investigative trickery, or even to reach the question of whether an affirmative misrepresentation by law enforcement officials as to the scope and seriousness of an interrogation is sufficient to render a confession involuntary."  *Ortiz v. Kelly,* 687 F.Supp. 64, 65 (E.D.N.Y. 1988) (citing *Colorado v. Spring*, 479 U.S. 564 (1987) (upholding waiver of *Miranda* rights despite lack of clarity as to suspect's understanding that interrogation was directed to a weapons possession violation or a homicide)).

In *Spring, supra,* the Court stated that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."  *Spring, supra,* at 859.  Further, in *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991), the Second Circuit stated that

> Regardless of whether the agent's statements were false, misleading, or intended to trick and cajole the defendant into confessing, specific findings must be made that under the totality of the circumstances - considering the three listed factors - the defendant's will was overborne by the agent's conduct.

*Anderson,* 929 F.2d at 99.

Here, Maney points to no evidence that either agent affirmatively misrepresented the purposes of the interview when Maney was invited to attend or upon Maney's arrival at the outset of the interview itself.  Additionally, no caselaw supports the notion that a failure to reveal fully to the accused the interrogator's specific investigative objectives vitiates an otherwise valid waiver of *Miranda* rights or the voluntary nature of any subsequent questioning.  That Maney mistakenly believed the interview was non-criminal in nature, or that the agents failed to make a formal declaration that it was not, is therefore irrelevant.  Thus, Maney's contention that the agents were obliged to warn him that they were seeking to elicit an admission that Maney had, when failing to remit the premiums, acted with a criminal intent is without merit.

Maney further asserts that Halter and Moehring did not advise Maney he did not need to make the written statement.  Maney Affidavit ¶ 3.  However, Maney fails to submit to any authority holding an interrogator is obliged to so advise suspects, and the court's research fails to reveal any.  The court has found Maney was not in custody during the interview, Discussion, *supra,* at 11-16, and, as such, the agents had no duty to advise Maney of his *Miranda* rights.  Accordingly, there was no requirement that the agents affirmatively advise Maney that he need not sign the statement, and their failure to do so is equally irrelevant to the question whether the giving of the statement and

signing of it by Maney were voluntary.

As noted, Maney also contends that Moehring threatened him with arrest if he did not sign the written statement prepared by Agent Halter, Tr. III 71; Maney Affidavit ¶ 3. The court finds, however, no credible evidence in the record to support this claim. Significantly, Moehring and Halter were never asked on cross-examination whether they threatened Maney with arrest if he did not sign the written statement.  Government's Memorandum at 30.  Certainly, if Maney believed such threat to have been made, some attempt to elicit concessionary testimony from the agents to support Maney's contention should have been made at the hearing.  Moreover, that Maney was encouraged to make changes to the written statement and did make what Maney likely considered a significant change in his estimate of the actual loss, Tr. III 36, 41, 42, severely undercuts Maney's contention that the statement resulted from a threatened arrest and was, as a result, rendered involuntary.

Maney further argues that his statement was involuntary because it was prepared by Halter instead of himself.  Defendant's Memorandum at 6-7.  Maney's contention assumes one has to physically write a statement in order that the statement may be found to be voluntary.  Again, Maney submits to no authority to support this novel proposition, nor has the court's research revealed any.

Finally, Maney contends his incomplete, or inaccurate, understanding of the word "illegal" as used in the statement, which was added by Agent Halter, demonstrates the statement's involuntary character.  Tr. III 113, 121-22; Defendant's Memorandum at 7. According to Maney, he understood "illegal" to mean the opposite of legal, Tr. III 113, but not indicative of any criminal intent, or more specifically an intent to steal the

22

premiums.  Defendant's Memorandum at 5 (citing Tr. III 114, 121).  Considering the

facts known to Maney at the time he reviewed and signed the statement, it is not

reasonable to believe that Maney's alleged incomplete, inaccurate, or even confused

understanding of the word "illegal" as used in the statement renders his acquiescence to

its inclusion to be an involuntary act on his part.  At that point in the scenario, Maney

knew, or reasonably should have known, that he was being investigated by federal

criminal law enforcement officers agents based on his having converted substantial

sums of money owed to the insurance companies for which he was an agent, and that

the investigators believed his conduct might be criminal.  Tr. III  103, 121-22.  For

example, Agent Halter told Maney that the FBI investigates alleged violations of federal

criminal law, including mail fraud.  Tr. I 48.  Further, when Maney was interviewed

earlier by Investigator Hahn, he was aware Hahn was with the New York State

Insurance Department's Frauds Bureau, and Hahn never represented that his

investigation was a purely non-criminal, civil investigation.  Tr. III 87.  If, as  Maney now

maintains, Moehring requested Maney's presence at the January 29, 2003 interview "to

cooperate with the investigation," Maney should have reasonably known that his

cooperation was requested in connection with a criminal investigation of his alleged

fraud.[7]  Any naivete on Maney's part regarding the agents' purposes is simply irrelevant.

Therefore, while Maney's acquiescence in the statement's description of his conduct as

"illegal," as evidence of Maney's intent at the time of the alleged misappropriations, may

present an issue of fact for trial, it does not obviate the otherwise strong indications of

---

[7] In his affidavit, Maney incorrectly refers to Hahn as the Postal Inspector who contacted him and
requested his presence at the January 29, 2003 interview.  Maney Affidavit ¶ 2.

the statement's overall voluntariness established by the record.

In sum, the court finds that Maney's will was not overborne by giving and signing the statement, as written by Halter and amended by Maney, as the statement summarized the oral admissions Maney conceded were voluntarily made during the interview, Maney reviewed and made changes to the statement, and agreed to sign it. Finally, that Halter wrote out the statement based on Maney's oral statements made during the interview does not demonstrate that Halter attempted to mislead or coerce Maney into signing the statement including Halter's inclusion of the word "illegal" to describe the character of Maney's intent.  As such, the court finds Maney's contention that his agreement to the statement was involuntary rendering it inadmissible is therefore also without merit.

**CONCLUSION**

Based on the foregoing, Defendant's motion (Doc. No. 21), should be DENIED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 19, 2006
            Buffalo, New York

24

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 19, 2006
            Buffalo, New York